IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STEVEN AGEE, | | |
| | Plaintiff, | 8:18-CV-371 |
| vs. | | |
| ERIC S. LIMA, COREY M. GORDEN, and THE CITY OF OMAHA, NEBRASKA, a Political Subdivision, | | MEMORANDUM AND ORDER |
| | Defendants. | |

The plaintiff, Steven Agee, brings this action, alleging in his second amended complaint civil rights violations pursuant to 42 U.S.C. § 1983 for false arrest and the unlawful seizure of his property. The individual defendants, Eric Lima and Corey Gorden, are City of Omaha police officers. The officer defendants in their individual capacity have moved for summary judgment on the basis of qualified immunity. The City and the officers in their official capacity have moved for summary judgment alleging that there is an absence of evidence supporting a claim for municipal liability. For the reasons that follow, the Court will deny the defendants' motion regarding the individual capacity claims against Lima and Gorden, and sustain the motion with respect to the official capacity claims against the officers and the City of Omaha.[1]

---

[1] The plaintiff's second amended complaint does not specifically state that the officers are sued in their individual capacity, but does state the officers acted in their official capacity. Filing 22. The second amended complaint, taken as a whole, and giving the reasonable inferences to be derived from the pled facts to the plaintiff, alleges that the officers were acting in both their individual and official capacity under color of law. The defendants answered, alleging that the officers acted in good faith, without malice, and are entitled to

# I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

---

qualified immunity. Filing 61 at 1. Qualified immunity is a defense available only to an individual, but not to officers acting in an official capacity. *Owen v. City of Independence*, 445 U.S. 622, 653 (1980). Accordingly, the defendants elected to not object to a potential pleading defect, and acknowledged that the second amended complaint alleges claims against the officers in both their individual and official capacities. *See Rollins by Agosta v. Farmer*, 731 F.2d 533, 535-36 (8th Cir. 1984).

## II. BACKGROUND

On the night of January 2, 2017, the plaintiff and his roommate, Jason Fisher, got into an argument about money. Filing 47-1, filing 47-3 at 41. Fisher was the son of the plaintiff's friend, and had worked with the plaintiff at a jobsite until Fisher was fired. Filing 47-3 at 40. After losing his job, Fisher could not afford his apartment. The plaintiff agreed to let Fisher stay in the plaintiff's rented house on the condition that they would split expenses. Filing 47-3 at 41. On the night of the argument, the plaintiff said that Fisher was three or four months behind on his share of rent, and that the plaintiff had paid other expenses for Fisher, expecting to be paid back. When Fisher came home from a party with his girlfriend, the plaintiff confronted him and told Fisher that things were not working out and he needed to find another place to live. Filing 47-3 at 41. Fisher said he did not have any other place where he could go, but the plaintiff responded that he did not care. Fisher then said he was going to call the police and tell them that the plaintiff had a handgun sitting on the coffee table. Filing 47-3 at 42.

Fisher made the call, telling the 911 operator that he was having a disturbance with his roommate. Filing 47-1; filing 47-2. Officers Lima and Gorden were dispatched to respond to Fisher's call, and were told that Fisher said the plaintiff was armed with a handgun. *Id.* On the way to the plaintiff's house, the officers were informed that the plaintiff was a concealed carry permit holder, and that the plaintiff had been served with a protection order on April 20, 2016. *Id.* Fisher met the officers upon their arrival and spoke with them outside. Filing 47-1. The officers asked Fisher whether the plaintiff had threatened him. *Id.* Fisher said no, but that he was just scared because the plaintiff kept handguns hidden throughout the house, and that on a prior occasion the plaintiff had discharged one of his firearms outside the house. *Id.*

Fisher gave the officers permission to enter the house, and once inside, the officers found the plaintiff sitting on a couch in the living room, but without a handgun. Filing 47-1; filing 47-3 at 43. The plaintiff told the officers that after learning that Fisher had called the police, he took the handgun that was on the coffee table upstairs to his bedroom and placed it in a drawer. Filing 47-2. The plaintiff also told the officers that he always keeps a handgun nearby because of the area he lives in. Fisher had told the officers that the plaintiff usually carried a handgun with him in the house. Filing 47-1. The officers asked the plaintiff how many firearms were in the house, and the plaintiff identified two rifles, a shotgun and several handguns. Filing 47-1. The plaintiff told the officers that he did not mean to be threatening by always keeping a firearm nearby. Filing 47-1.

The officers asked the plaintiff whether he knew he was the subject of a protection order. According to the officers, the plaintiff said he knew that a previous girlfriend had filed one, but he believed that it was not currently active. Filing 47-1. Also, according to the officers, when they told the plaintiff that the protection order prohibited him from possessing firearms, the plaintiff said that he was unaware of the prohibition, and that had he known of the prohibition, he would have happily given his firearms to his son or another person. Filing 47-1; filing 47-2. The plaintiff said he was pretty sure he told the officers that the protection order was a harassment protection order. Filing 47-3 at 43. In fact, the plaintiff was subject to a harassment protection order dated April 19, 2016, prohibiting the plaintiff from contacting or otherwise disturbing the peace of his former girlfriend for one year. Filing 52-5.

The officers confirmed through the police information channel that the protection order was current and active. *Id.* The plaintiff does not recall whether the officers referred to the protection order as a harassment protection

4

order, but recalls that the officers told him he was a "prohibited person" because there was a protection order against him. Filing 47-3 at 45. The officers do not report whether they confirmed the type of protection order entered against the plaintiff, but believed that the protection order in force against the plaintiff made him a person prohibited from possessing firearms. As such, the officers placed the plaintiff under arrest for possession of a firearm by a prohibited person. Filing 47-1; filing 47-2.

After the plaintiff was told he was under arrest, the officers asked him to lead them to all of his firearms. Officer Lima reported that the plaintiff was extremely cooperative and directed the officers to all of the firearms in his house. Filing 47-1. The plaintiff's firearms were collected and booked into property by Officer Gorden. Filing 47-1; filing 47-2. The officers booked the plaintiff into Douglas County Corrections that night, and the plaintiff remained confined for the next twenty-one days before being released. Filing 22 at 2. The plaintiff's confiscated firearms were returned to him on April 17, 2017. Filing 48 at 3.

The plaintiff testified in his deposition that Fischer told his father that one of the officers told the other officer, "I think we're f**king up here" because the plaintiff was not a convicted felon. Filing 47-3 at 45. In answers to the plaintiff's requests for admission, Lima admitted that at the time of the plaintiff's arrest, he did not verify the type or nature of the protection order issued against the plaintiff, and that he did not know the difference between a domestic violence protection order and a harassment protection order. Filing 52-1. Officer Gorden admitted that he did not verify the type of the protection order at the time of the plaintiff's arrest, but denied that he did not know there was a difference between a domestic violence protection order and a harassment protection order. Filing 52-2.

## III. DISCUSSION

### 1. FALSE ARREST

The doctrine of qualified immunity shields law enforcement officers performing discretionary functions from personal liability under § 1983 if the officers' conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Qualified immunity gives law enforcement officers breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law. *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011).

To overcome the defendants' qualified immunity defense, the plaintiff must show; (1) that the facts, viewed in the light most favorable to him, demonstrate the deprivation of a constitutional right, and (2) the right was clearly established at the time of the deprivation. *Baribeau v. City of Minneapolis,* 596 F.3d 465, 474 (8th Cir. 2010). The Court may exercise its sound discretion in deciding which qualified immunity prong to address first. *Pearson,* 555 U.S. at 236.

The officers assert that the plaintiff's Fourth Amendment constitutional rights were not violated when he was arrested without a warrant. Filing 48 at 8-11. They argue that they are entitled to qualified immunity because there was probable cause to arrest the plaintiff for possession of a weapon by a prohibited person resulting from the plaintiff's violation of the protection order. The circumstances giving rise to the officers' belief that there was probable cause to arrest the plaintiff was the information that they were given enroute to the plaintiff's house, confirmation that the plaintiff was subject to a protection order via the police information channel after speaking with the

plaintiff, and the plaintiff's acknowledgment that he knew about a protection order filed by a former girlfriend. Filing 48 at 8-11.

A warrantless arrest is consistent with the Fourth Amendment if supported by probable cause. *Thurairajah v. City of Fort Smith, Ark.*, 925 F.3d 979, 983 (8th Cir. 2019). Officers have probable cause to arrest a suspect without a warrant when the totality of the circumstances at the time of the arrest are sufficient to cause a reasonable person to conclude that the suspect committed or is committing a crime. *Id.*

In January 2017, there were three types of protection orders—domestic violence, harassment, and sexual assault—but only one of those protection orders, a domestic violence protection order, criminalized possession of a firearm or other deadly weapon.

> (1)(a) Any person who possesses a firearm, a knife, or brass or iron knuckles and who has previously been convicted of a felony, who is a fugitive from justice, or who is the subject of a current and validly issued domestic violence protection order and is knowingly violating such order, or (b) any person who possesses a firearm or brass or iron knuckles and who has been convicted within the past seven years of a misdemeanor crime of domestic violence, commits the offense of possession of a deadly weapon by a prohibited person.

Neb. Rev. Stat. § 28-1206(1) (Reissue 2016).

When the plaintiff was arrested, a person subject to a harassment protection order, such as the plaintiff, was not, pursuant to Nebraska law, prohibited from possessing firearms. The officers do not offer any reason other than violation of the harassment protection order as justification for the plaintiff's arrest. Accordingly, the Court finds that no reasonable person could

conclude that the plaintiff had, in fact, violated Nebraska law by possessing any of the several firearms confiscated by the officers. Accordingly, the plaintiff's arrest was not supported by probable cause.

But qualified immunity does not rest on probable cause in fact—alone. The officers would be entitled to qualified immunity for the plaintiff's warrantless arrest if the arrest was supported by arguable probable cause. *Ross v. City of Jackson, Missouri,* 897 F.3d 916, 921 (8th Cir. 2018). In other words, for the purposes of qualified immunity, the issue is not whether there is probable cause in fact, but whether there is arguable probable cause. *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir. 1999). Arguable probable cause affords a law enforcement officer an even wider berth for mistaken judgments than what the probable cause standard provides a reasonable person. *Thurairajah,* 925 F.3d at 983. Arguable probable cause is a mistaken, but objectively reasonable belief, the suspect committed, or is committing, a crime. *Hoyland v. McMenomy,* 869 F.3d 644, 652 (8th Cir. 2017).

Accordingly, the question this Court must answer is whether it was objectively reasonable for Officers Lima and Gorden to mistakenly believe, considering the totality of the circumstances, that the plaintiff was a person prohibited by Nebraska law from possessing firearms. *Id.* Whether arguable probable cause exists depends on what the officers knew at the time they determined there was probable cause to arrest the plaintiff, and what a reasonably thorough investigation would have uncovered about the likelihood that a crime had been committed. *Ross,* 897 F.3d at 921. The officers were not required to conduct a "mini-trial" before arresting the plaintiff. *Kuehl,* 173 F.3d at 650. The officers could also rely on information they obtained when they were dispatched to answer Fisher's call, and the information they received when they called into the police information channel to confirm what they had

been told. *See [Borgman v. Kedley,](#) 646 F.3d 518, 523 (8th Cir. 2011)*. But the officers had a duty to conduct a reasonably thorough investigation given the absence of exigent circumstances, and where they would not have been hampered by waiting to obtain more facts before arresting the plaintiff. *[Ross, 897 F.3d at 922.](#)* Probable cause does not exist when a minimal further investigation would have exonerated the suspect. *[Kuehl,](#) 173 F.3d at 650*.

Considering the totality of the circumstances, on January 2, 2017, there was not an open legal question, and it was not objectively reasonable to believe that a person subject to a harassment protection order was prohibited from possessing firearms. The text of § 28-1206(1), as it existed in January 2017, is plain and unambiguous and includes as prohibited persons only those subject to a domestic violence protection order.[2] Officers are not expected to "parse code language as though they were participating in a law school seminar." *[Walker v. City of Pine Bluff,](#) 414 F.3d 989, 993 (8th Cir. 2005)*. But here, there was no code language to parse.[3] There was no legal basis to conclude that a person subject to a harassment protection order was prohibited from possessing firearms. This was not an open legal question in January 2017.

Moreover, had the officers conducted a minimal further investigation, they would have discovered that the plaintiff was not prohibited from

---

[2] However, later in 2017, the Nebraska legislature passed, and the Governor signed into law, LB 289, which amended § 28-1206(1) to include domestic violence, harassment, and sexual assault protection orders.

[3] In *Walker*, the court concluded that no reasonable officer could conclude that the plain text of the statute regarding obstruction of governmental operations would apply to a mere onlooker. 414 F.3d at 993; *see also [Thurairajah,](#) 925 F.3d at 983* (No reasonable officer would conclude that the disorderly conduct statute criminalized shouting a two-word insult from a passing car).

possessing firearms. The reasonable inference from Gorden's response to the plaintiff's request for admission is that he was aware there was a difference between a domestic violence protection order and a harassment protection order, but neither he nor Lima investigated further to determine whether both kinds of protection orders precluded the plaintiff from possessing firearms. Filing 52-1; filing 52-2. The plaintiff told the officers that he was aware of the protection order filed by a former girlfriend, but was unaware that the protection order did not allow him to possess firearms. Filing 47-3 at 43-44; filing 47-1. There is also evidence that one of the officers believed there was a problem arresting the plaintiff because he was not a convicted felon. Filing 47-3 at 45.

There were several reasons for the officers to conduct a minimal further investigation, and there were no exigent circumstances preventing them from doing so. According to Lima's report, the plaintiff was extremely cooperative, Fisher admitted that the plaintiff had not threatened him, and the plaintiff said that he did not intend the handgun that he usually kept close by while at home to be threatening. Filing 47-1. The officers were not required to believe what the plaintiff told them or rely on his explanations for why he possessed firearms, but neither could they avoid a minimal further investigation if it would have exonerated the plaintiff. *Nader v. City of Papillion*, 917 F.3d 1055, 1058 (8th Cir. 2019).

For the reasons stated above, the Court finds that the individual officers did not have arguable probable cause to arrest the plaintiff. Also, in January 2017, it was clearly established that a warrantless arrest, unsupported by probable cause, violated the Fourth Amendment. *See Baribeau*, 596 F.3d at 478. The Court finds that the individual officers are not entitled to qualified immunity regarding the plaintiff's warrantless arrest.

## 2. UNLAWFUL SEIZURE OF FIREARMS

The officer defendants argue that they are entitled to qualified immunity regarding the seizure of the plaintiff's firearms because there was probable cause supporting the plaintiff's warrantless arrest for possession of a weapon by a prohibited person, and the firearms were lawfully seized as evidence in support of the plaintiff's alleged law violation. Having determined that the plaintiff's warrantless arrest lacked probable cause, or even arguable probable cause, the Court also rejects the defendants' argument that the plaintiff's weapons were lawfully seized as evidence supporting the plaintiff's warrantless arrest. Accordingly, the individual officers are not entitled to qualified immunity regarding the seizure of the plaintiff's firearms—but for that reason alone. Because the defendants have not asserted any other basis or justification regarding the seizure of the plaintiff's firearms, the Court's decision does not foreclose the officers from asserting any other grounds for qualified immunity regarding the seizure of the plaintiff's firearms.

## 3. OFFICIAL CAPACITY

The City, and the officers in their official capacity, may not be found liable unless conduct pursuant to an official City policy caused the constitutional tort alleged by the plaintiff. *Dean v. Searcey*, 893 F.3d 504, 511 (8th Cir. 2018). Also, the City cannot be held liable on a *respondeat superior* theory, in other words, liable simply because Lima and Gorden were law enforcement officers employed by the City. *S.M. v. Lincoln Cty.,* 874 F.3d 581, 585 (8th Cir. 2017).

The plaintiff has not identified, or even alleged, the existence of a City policy or conduct by the City's law enforcement policymaker that was a cause

of the plaintiff's warrantless arrest or the seizure of his firearms. The Court finds that there is a complete absence of evidence to support the plaintiff's official capacity claims against the officers and the plaintiff's claims against the City. The Court finds that the City and the officers in their official capacities should be dismissed.

### 4. THE PLAINTIFF'S LOST WAGE CLAIM

The defendant asserts that there is no evidence in support of the plaintiff's lost wages claim, and that the plaintiff's claim should be denied. Filing 48 at 14-15. The defendant argues that the plaintiff admitted that he was unemployed on the day that he was arrested, and that he only planned on calling in to go back to work.

The plaintiff was employed in the construction trade, and at the time of his arrest was on a layoff. Filing 47-3 at 41. He planned to call in for work had he not been arrested, and when he was released from confinement, the plaintiff did call in and went back to work. Filing 47-3 at 41-42. The defendants are confusing unemployed with unemployable. There is a genuine issue of material fact whether the plaintiff would have been employed had he not been unlawfully confined. It will be the plaintiff's burden at trial to adduce evidence that had he not been unlawfully arrested, he would have been employed, and the amount of wages he lost because of his confinement from this arrest on this occasion.

### 5. OTHER MATTERS RAISED BY THE PLAINTIFF

The plaintiff argues that the defendants failed to timely answer the plaintiff's second amended complaint, and vaguely suggests that the Court should sanction the defendants in some unspecified manner. Filing 51 at 5-7.

The record reflect that defendants were given leave to file an answer out of time on July 29, 2019. Filing 60. The defendants' answer to the plaintiff's second amended complaint was promptly filed that same day. Filing 61. The plaintiff has not objected to the Magistrate Judge's order granting the defendants' leave to file an answer out of time. Accordingly, the plaintiff's argument is moot.

The plaintiff also argues that the defendants' motion for summary judgment was untimely filed and should be declared void. Filing 51 at 8. The record reflects that the Amended Final Progression Order in this matter provided that the deadline for filing motions for summary judgment was July 29, 2019. Filing 44 at 2. The defendants' motion for summary judgment was filed on June 3, 2019. Filing 46. The plaintiff is simply incorrect.[4] The defendants' motion for summary judgment was timely filed.

> IT IS ORDERED that the defendants' motion for summary judgment (filing 46) is granted in part and denied in part as set forth above.

Dated this 21st day of October, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge

---

[4] The plaintiff relies on the initial progression order (filing 7), which provided an earlier deadline of February 1, 2019 for summary judgment motions "based on qualified immunity." Filing 7 at 2. But that deadline was never reached because it was supplanted by the *final* progression order on January 3. Filing 38. The amended final progression order entered April 8 (filing 44) is the operative progression order.